Nancy **LOZADA**, Bob Warren, A.D. Christian and Jeanne Uwamaliya, on behalf of themselves and all other similarly situated, Plaintiffs,

v.

**DALE BAKER OLDSMOBILE, INC.,** a Delaware corporation, d/b/a Dale Baker KIA, d/b/a Dale Baker Suzuki, d/b/a Fresh Start Auto Center, and d/b/a National Fleet Liquidators of Michigan; and CFC–Consumer Finance Corporation, f/k/a Consumer Finance Corporation, a Virginia corporation, Defendants.

No. 1:99–CV–620.

United States District Court, W.D. Michigan, Southern Division.

Sept. 14, 2000.

John E. Anding, Drew, Cooper & Anding, Phillip C. Rogers, Grand Rapids, MI, for plaintiffs.

Michael D. Wade, Garan, Lucow, Miller & Seward, PC, David N. Campos, Grand Rapids, William K. Holmes, Warner, Norcross & Judd LLP, Grand Rapids, MI, for defendants.

## OPINION

HILLMAN, Senior District Judge.

Plaintiffs are consumers who have filed a class action complaint alleging that Defendant Dale Baker Oldsmobile, Inc. ("Dale Baker Olds") failed to provide them a copy of their retail installment contracts at the time of execution, allegedly in violation of the Truth in Lending Act ("TILA"), 15 U.S.C. §§ 1601 *et seq.*, the Michigan Consumer Protection Act ("MCPA"), Mich. Comp. Laws §§ 445.901 *et seq.*, the Michigan Motor Vehicle Installment Sales Contracts Act ("MVISCA"), Mich. Comp. Laws §§ 566.301 *et seq.*, and the Michigan Motor Vehicle Sales Finance Act ("MVSFA"), Mich. Comp. Laws §§ 492.101 *et seq.* Plaintiffs' complaint also names as a defendant CFC–Consumer Finance Corporation ("CFC"), the assignee of a contract between Dale Baker Olds and one of the named plaintiffs.

The court previously has issued opinions on motions to dismiss, to enforce an arbitration clause and to stay this action pending appeal of the arbitration issue by defendant CFC–Consumer Finance Corporation. The case presently is stayed as to defendant CFC.

The matter presently is before the court on three motions: (1) plaintiffs' motion for

class certification (docket # 68)[1]; (2) plaintiffs' motion for partial summary judgment (docket # 111); and (3) plaintiffs' motion to bar defendant Dale Baker Oldsmobile's expert witness from testifying (docket # 108). For the reasons that follow, all three motions are **GRANTED**.

## I.

The following facts are undisputed. Plaintiffs Nancy Lozada, Bob Warren, A.D. Christian and Jeanne Uwamaliya were all customers of Dale Baker Olds who sought to purchase motor vehicles on credit. Because of their credit histories, Dale Baker Olds salesmen determined that plaintiffs would not be eligible for conventional auto financing. As a result, the salesmen referred plaintiffs to the Dale Baker Olds special finance department or Credit Resources Center. After selecting a vehicle, each plaintiff was introduced to the Assistant Special Finance Manager, Stormie Moore, in order to complete the necessary documentation to obtain credit to finance their vehicles in the sub-prime credit market. At that time, each plaintiff was presented with and signed a retail installment sales contract ("RISC") which contained disclosures of the annual percentage rate, finance charge, amount financed, total sale price, and payment schedule. Those disclosures were contained under the heading, "TRUTH IN LENDING DISCLOSURES," and placed immediately above the signature line.

While plaintiffs were shown their RISCs at the time they signed them and while those installment contracts contained disclosures, plaintiffs were not given a copy of the contracts or disclosures until some days or weeks after they signed their agreements, and after their contracts were acquired by third-party finance companies. Plaintiff Lozada received a copy ten days after signing the document. Plaintiff Warren received a copy two days after signing the document. Plaintiff Christian received a copy fifteen days after signing. Plaintiff Uwamaliya never received a copy because her contract was not purchased by a third party lender.

On the basis of this history, plaintiffs contend that Dale Baker Olds failed to make the disclosures required by the TILA and the relevant regulations promulgated by the Federal Reserve Board pursuant to its authority under the TILA. The four named plaintiffs purport to represent a class of between 375 and 500 customers of Dale Baker Olds who entered into contracts through the Special Finance Department.

Following a motion by Dale Baker Olds to dismiss plaintiffs' TILA claim pursuant to FED. R. CIV. P. 12(b)(6) for failure to state a claim and to dismiss plaintiffs' state law claims for lack of subject matter jurisdiction, pursuant to FED. R. CIV. P. 12(b)(1), this court, in an opinion and order dated March 27, 2000, held that failure to deliver a copy of the disclosures at the time of signing stated a claim under the TILA (docket ## 66, 67).

Plaintiffs now move for class certification, for partial summary judgment on the TILA and state-law claims, and to strike defendant's expert.

## II.

### A. *Motion for Class Certification*

Rule 23 of the Federal Rules of Civil Procedure provides that one or more members of a class may sue as representative parties on behalf of all members of a class. *Id.* The rule requires that four prerequisites be met:

> One or more members of a class may sue or be sued as representative parties on behalf of all only if (1) the class is so numerous that joinder of all parties is impracticable, (2) there are questions of law or fact common to the class, (3) the claims or defenses of the representative parties are typical of the claims or defenses of the class, and (4) the representative parties will fairly and adequately protect the interests of the class.

FED. R. CIV. P. 23(a). The requirements of Rule 23(a) are referred to as "numerosity,

---

**1.** Also pending is a related motion for permission to supplement material submitted in connection with plaintiffs' pending motion for class certification (docket # 107). The unopposed motion to supplement is **GRANTED** and the supplemental materials attached to the motion are hereby included as part of the documentation supporting the motion for class certification.

commonality, typicality and adequacy of representation." *See Peters v. Cars To Go, Inc.,* 184 F.R.D. 270, 275 (W.D.Mich.1998). A court may certify a class action only if all four requirements are met. *In re American Medical Systems, Inc.,* 75 F.3d 1069, 1079 (6th Cir.1996).

If each of the four requirements of Rule 23(a) is met, the party seeking certification must also show that the action falls within one of the categories listed in Rule 23(b). In the instant case, plaintiffs attempt to demonstrate that the action falls within Rule 23(b)(3), which provides that an action may be certified if:

> (3) the court finds that the questions of law or fact common to the members of the class predominate over any questions affecting only individual members, and that a class action is superior to other available methods for the fair and efficient adjudication of the controversy. The matters pertinent to the findings include: (A) the interest of members of the class in individually controlling the prosecution or defense of separate actions; (B) the extent and nature of any litigation concerning the controversy already commenced by or against members of the class; (C) the desirability or undesirability of concentrating the litigation of the claims in the particular forum; (D) the difficulties likely to be encountered in the management of a class action.

*Id.*

A district court has broad discretion in deciding whether to certify a class, but must conduct a rigorous analysis to ensure the prerequisites of the rule are met. *American Medical Systems, Inc.,* 75 F.3d at 1078–79. The party seeking class certification bears the burden of proof. *Id.* In determining whether to certify a class action, the district court must accept as true the allegations of plaintiffs' complaint and resolve doubts in favor of plaintiffs. *See Cross v. Nat'l Trust Life Ins. Co.,* 553 F.2d 1026, 1029 (6th Cir.1977).

Plaintiffs propose that the following class be certified:

> All persons who executed a retail installment contract through the special finance department of Dale Baker Oldsmobile, Inc., where Dale Baker Oldsmobile, Inc. was identified on the face of the contract as the entity to whom the debt arising from the contract is or was initially payable, and who were not given a copy of the contract at the time of its execution.

Plaintiffs further propose that the class period in connection with the federal TILA claim be limited to those who meet the class definition and whose retail installment contracts were executed during the one-year period between August 16, 1998, and the date of filing of the complaint in the instant case, August 16, 1999. Plaintiffs propose that the class period in connection with the state-law counts be limited to those whose retail installment contracts were executed during the six-year period immediately preceding the date of filing of plaintiffs' complaint on August 16, 1999.[2]

### 1. Numerosity

Rule 23(a)(1) requires that before certifying a class, the court must determine that the "class is so numerous that joinder of all members is impracticable...." *Id.* Where a class is large, the impracticability requirement is usually satisfied. *American Medical Sys.,* 75 F.3d at 1079. However, impracticability of joinder is not determined on the basis of a strict numerical test, but upon the circumstances surrounding the case. *See Senter v. Gen. Motors Corp.,* 532 F.2d 511, 523 (6th Cir.1976). In determining whether the numerosity requirement is met, the court need not know the exact number of class members, but may proceed upon estimates as to the size of the proposed class. *See In re Alcoholic Beverages Litig.,* 95 F.R.D. 321 (E.D.N.Y.1982); HERBERT B. NEWBERG, ALBA CONTE, 2 NEWBERG ON CLASS ACTIONS (hereafter "NEWBERG") § 7.22, p. 7–77 (3d ed.1992). Moreover, impracticability is not impossibility. 1 NEWBERG, § 3.03, p. 3–11 (citing cases).

---

**2.** Presumably, these periods are established to conform with the limitations periods of the re-

spective federal and state laws. *See* 15 U.S.C. § 1640(e); Mich. Comp. Laws § 600.5813.

Here, Dale Baker has admitted that its special finance department arranged indirect loans in connection with the sale of 497 motor vehicles during the one-year period between August 16, 1998 and August 31, 1999. *See* Dale Baker Oldsmobile, Inc.'s Supplemental Answers to Plaintiffs' First Interrogatories to Dale Baker Oldsmobile, Inc., ¶ 18. During the period Stormie Moore served as Special Finance Manager and Daryl Moore served as Special Finance Director (between December 1998 and September 1999), Dale Baker Oldsmobile admits that at least 377 such transactions occurred. In addition, Dale Baker's Chief Financial Officer, Donald M. Kolehouse, admitted that Dale Baker's special finance department had a practice of not giving consumers a copy of the retail installment sales contract ("RISC") during the entire period during which the Moores headed the department. (Kolehouse dep. pp. 78–83.) This admission is supported by the deposition testimony of both of the Moores that the retention of the customer copy of the RISC was the practice of the department during the entire period. (S. Moore dep. at 39–40; D. Moore dep. at 30–31.)

Dale Baker makes two arguments why the proposed class does not meet the numerosity requirement. First, Dale Baker suggests, but does not expressly state, that the numerosity test requires that the putative class contain thousands of members. *Citing American Medical Sys.*, 75 F.3d at 1079 (finding numerosity with 15,000 to 20,000 persons in putative class). Numerosity, however, is not dependent on such extreme numbers in the proposed class. Several courts have noted that classes numbering more than 40 members presumptively satisfy the impracticability requirement. *See Consolidated Rail Corp. v. Town of Hyde Park*, 47 F.3d 473, 483 (2d Cir.1995) (stating that "numerosity is presumed at a level of 40 members"); *Peters*, 184 F.R.D. at 276 (citing *Cox v. American Cast Iron Pipe Co.*, 784 F.2d 1546, 1553 (11th Cir.1986)); *Johnson v. Rohr–Ville Motors, Inc.*, 189 F.R.D. 363, 368 (N.D.Ill. 1999).

Moreover, courts have certified classes with smaller class sizes than the instant case both in TILA cases and in cases involving other subject matter. *See Peters*, 184 F.R.D. at 276 (TILA case involving less than 200 plaintiffs); *Johnson*, 189 F.R.D. at 368 (TILA case with less than 400 plaintiffs); *Reed v. Chartwell Fin. Servs., Ltd.*, Nos. 98–C–6965, 6966, 1999 WL 181986 (N.D.Ill.1999) (in TILA case, class of 120 met numerosity requirement); *Williams v. Empire Funding Corp.*, 183 F.R.D. 428 (E.D.Pa.1998) (TILA class smaller than 300); *Lopez v. Orlor, Inc.*, 176 F.R.D. 35 (D.Conn.1997) (TILA class of 300). *See also Jenson v. Eveleth Taconite Co.*, 139 F.R.D. 657 (D.Minn.1991) (sexual harassment case involving 65 employees and 23 applicants); *Leyva v. Buley*, 125 F.R.D. 512 (E.D.Wash.1989) (joinder of 50 migrant workers impracticable given their limited or nonexistent English skills and knowledge of legal system); *Committee of Blind Vendors v. District of Columbia*, 695 F.Supp. 1234 (D.D.C.1988) (joinder of 63 blind vendors impracticable in light of plaintiffs' meager resources), *rev'd on other grounds*, 28 F.3d 130 (1994); *Anderson v. Douglas & Lomason Co.*, 122 F.R.D. 502 (N.D.Miss.1988) (approximately 100 members of class in race employment case was sufficient); *Polich v. Burlington N., Inc.*, 116 F.R.D. 258 (D.Mont.1987) (class of 60 potential members sufficient).

Further, as the Supreme Court has acknowledged, in TILA cases such as this one, it may not be economically feasible to obtain relief within the traditional framework of a multiplicity of small individual suits for damages, making class actions the preferred method of providing effective redress. *See Deposit Guar. Nat'l Bank v. Roper*, 445 U.S. 326, 339, 100 S.Ct. 1166, 63 L.Ed.2d 427 (1980). Adjudication in a single action may better serve the interests of the legislation as well as judicial economy. *Id.*

Dale Baker next suggests that class size is measured by counting only those persons who have come forward as named plaintiffs or who have contacted plaintiffs' attorney to express an interest in the case. As a result, Dale Baker contends that the number in the class is only four.

Dale Baker's contention is contrary to the structure of the rule and the case law, and Dale Baker has cited no case supporting the

proposition. While some courts have pointed to large numbers of potential class members having contacted the proposed class attorney as support for a finding of numerosity, *see Van Vels v. Premier Athletic Center of Plainfield, Inc.*, 182 F.R.D. 500 (W.D.Mich. 1998), neither the cases nor the rule itself suggest that only those who have come forward may be counted as members of a potential class.

I am satisfied that joinder of approximately 400 to 500 individuals is presumptively impracticable on the numbers alone and further impracticable in light of the claims at issue in this case.

### 2. Commonality

■ The second prerequisite to class certification is that there be "questions of law or fact common to the class." FED. R.CIV. P. 23(a)(2). The commonality requirement is met if there is one question of law or fact. *See Bittinger v. Tecumseh Products Co.*, 123 F.3d 877, 884 (6th Cir.1997). The commonality test does not mandate that all questions raised in the litigation need be common so long as at least one issue is common to all class members. *American Medical Sys.*, 75 F.3d at 1080. "When the party opposing the class has engaged in some course of conduct that affects a group of persons and gives rise to a cause of action, one or more of the elements of that cause of action will be common to all of the persons affected." *Rodriguez v. Berrybrook Farms, Inc.*, 672 F.Supp. 1009, 1015 (W.D.Mich.1987). In addition, resolution of the common issue must actually advance the litigation. *See Sprague v. General Motors Corp.*, 133 F.3d 388, 397 (6th Cir.1998).

■ Dale Baker Oldsmobile contends that there exist no disputed facts that create common questions of law or fact. Dale Baker's argument, however, is somewhat convoluted. Defendant concedes that no question of fact exist that all plaintiffs voluntarily signed contracts and Dale Baker Olds did not provide hard copies of those contracts at the time they were signed. Defendant contends, however, that because the failure to provide copies was a technical violation, no common question of law or fact exists.

Whether Dale Baker's conduct violated the TILA and state statutes and whether any violation was merely technical are questions of law that are common to the entire class. The uncontroverted evidence is that at least during the period when the special finance department was managed by the Moores, buyers seeking funding through that department were never given copies of the contracts they signed until after those contracts had been purchased by a third party lender. The question of the legal consequence of such standard procedures is common to all class members and central to the entire case under the TILA and under the various state claims. As a result, multiple common questions exist based on the common treatment of plaintiffs.

Dale Baker next argues that plaintiff A.D. Christian raises a claim not raised by any other named plaintiff—that he did not understand the documents at the time they were executed because he did not read them. The existence of some claims not common to the class does not bar certification of the class. Indeed, the rule requires only that one question be common, not that all questions be common. *American Medical Sys.*, 75 F.3d at 1080. The "mere fact that questions peculiar to each individual member of the class remain after the common questions of the defendant's liability have been resolved does not dictate the conclusion that a class action is impermissible." *Sterling v. Velsicol Chem. Corp.*, 855 F.2d 1188, 1197 (6th Cir.1988).

The requirement of commonality clearly is met on the facts of this case.

### 3. Typicality

■ Rule 23(a)(3) requires that the claims of the named plaintiffs be typical of the claims of the class. " '[A] plaintiff's claim is typical if it arises from the same event or practice or course of conduct that gives rise to the claims of other class members, and if his or her claims are based on the same legal theory.' " *American Medical Sys.*, 75 F.3d at 1082 (quoting 1 NEWBERG § 3.13 at 3–76). "To be typical, a representative's claim need not always involve the same facts or law, provided there is a common element of fact or law." *Senter*, 532 F.2d at 525, *quoted*

*in American Medical Sys.*, 75 F.3d at 1082. The requirement helps to assure "that the representative's interests will be aligned with those of the represented group, and in pursuing his claims, the named plaintiff will also advance the interests of the class members." *Id.*

▆▆▆ Dale Baker contends that the named plaintiffs are not typical because they have substantially different payment histories on their loans. Specifically, defendant asserts that while plaintiff Lozada has continued to make payments to Dale Baker as agreed in her original agreement, plaintiff Christian now makes his payments to a third-party financing company. Plaintiff Warren[3], in turn, refinanced the vehicle at his own bank without making any payments to either Dale Baker or a third-party finance company. Plaintiff Uwamaliya has failed to make her payments entirely.

The differences in payment history raised by Dale Baker are without relevance to the merits of the legal claims in this case. While it is possible that each of the named plaintiff's damages may be somewhat different as a result of their different payment histories, the basic legal claims—those that are common to the class—are identical. As a result, the named plaintiffs are typical of the class.

### 4. Adequacy of Representation

Under Rule 23(a)(4), the court may certify a class only if "the representative parties will fairly and adequately protect the interests of the class." FED. R. CIV. P. 23(a)(4). The element is viewed as a requirement of due process, as adjudication of the claim will be binding upon all class members. *See Hansberry v. Lee*, 311 U.S. 32, 61 S.Ct. 115, 85 L.Ed. 22 (1940); *see also American Medical Sys.*, 75 F.3d at 1083.

▆▆▆ The Sixth Circuit has identified two criteria for determining the adequacy of representation. First, the representative must have common interests with the unnamed members of the class. Second, it must appear that the representatives will vigorously prosecute the interests of the class through

qualified counsel. *See American Medical Sys.*, 75 F.3d at 1083 (quoting *Senter*, 532 F.2d at 525 (quotations omitted)). The adequacy-of-representation requirement requires the court to determine "the experience and ability of counsel for the plaintiffs and whether there is any antagonism between the interests of the plaintiffs and other members of the class they seek to represent." *Cross*, 553 F.2d at 1031. "The adequacy of representation requirement overlaps with the typicality requirement because in the absence of typical claims, the class representative has no incentives to pursue the claims of the other class members." *American Medical Sys.*, 75 F.3d at 1083.

▆▆▆ In demonstrating adequacy of representation, plaintiffs have the initial burden to show facts sufficient to support a finding that they will fairly and adequately protect the interests of the class. 2 NEWBERG § 7.24 at 7–80, 7–81. In most instances, adequacy is presumed in the absence of contrary evidence by the party opposing class certification. *Id.* at 7–81. Doubts about adequate representation should be resolved in favor of upholding the class, subject to later possible reclassification or the creation of subclasses. *Id.* at 7–82 (citing cases).

Dale Baker does not contest the adequacy of class counsel. Plaintiffs' counsel are experienced class action attorneys with expertise in consumer rights litigation. Counsel unquestionably is adequate to serve the interests of the class.

In the instant case, each of the named plaintiffs has filed a lengthy affidavit describing personal treatment by Dale Baker that allegedly is common to the entire class. Each also has averred that she or he has been extensively advised by counsel as to the obligations of serving as class representative, as well as the method of financing class notice and other expenses of the litigation. All have averred that they are willing to meet those obligations and that they have no conflicting personal interests or expectations of personal gain.

---

**3.** Dale Baker on several occasions refers to plaintiff "Cooper." In each instance, it appears that

Dale Baker intends to refer to plaintiff Warren, and the court has so treated each reference.

■ Dale Baker contends, however, that the named plaintiffs are not adequate for a series of personal reasons. First, Dale Baker contends that plaintiff Lozada lacks financial integrity because she has been through a prior bankruptcy and defaulted on a prior car loan. Dale Baker argues that she lacks motivation to pay her own legitimate debts and to protect her financial interests, and therefore is unqualified to manage the financial interests of the class.

Dale Baker's argument is specious. The fact that plaintiff Lozada has experienced credit difficulties does not make her an untrustworthy class representative. Indeed, because the violations at issue in this case occurred with respect to the special finance department at Dale Baker, presumably all or most class members have problematic credit histories. As a result, far from disqualifying plaintiff Lozada, the credit history represents a shared factual history with the class. In addition, having a poor credit history may occur for many reasons and constitutes far too slender a reed to support the broad conclusion that plaintiff Lozada is untrustworthy.

I conclude that Dale Baker has not sufficiently challenged Lozada's qualifications as set forth in her affidavit. I therefore am persuaded that plaintiff Lozada is qualified to serve as a representative of the class.

■ Dale Baker next challenges plaintiff Warren on the basis that he is distrustful of the legal system. Dale Baker contends that this distrust could taint his judgment to the detriment of the class. I am not persuaded that a generalized distrust of the legal system is disqualifying. Plaintiff Warren, like the other named plaintiffs, has virtually identical legal claims with those of the class. He has overridden his general distrust of the system to bring the action, retaining highly qualified counsel to do so. Like the other plaintiffs, he has attested to experiencing the common treatment by Dale Baker and to his willingness to meet the obligations of class representative. I am satisfied that plaintiff Warren will serve as an adequate class member.

■ Defendant next challenges the adequacy of plaintiff Christian as a man of limited education. Dale Baker argues that because plaintiff Christian testified that he needed more time to read than allowed by Dale Baker personnel yet refused to speak up, he necessarily is a passive person who will be unable to vigorously prosecute the interests of the class.

I disagree. Dale Baker's reasoning is logically fallacious, permitting gross generalization from a single incidence of conduct. Moreover, I do not accept defendant's argument that because a plaintiff alleges that he was successfully pressured by the defendant in circumstances that are the subject of this lawsuit, that plaintiff cannot serve as a representative of a class of persons who at least in part were similarly treated. Such an argument, like Dale Baker's argument regarding plaintiff Lozada, would immunize unscrupulous defendants from the consequences of their own behavior. Further, nothing in this case suggests that Christian's own trial attorneys will attempt to pressure him in the way he alleges he was pressured at the time of his transaction. Moreover, where a plaintiff shares the claims of the class and has no conflict with that class, the courts typically conclude that the question of whether the claims will be vigorously prosecuted is determined by the quality of class counsel. *See* 1 NEWBERG § 3.24 at 3–133 (citing cases). Here, no dispute exists that class counsel is well qualified to assure vigorous prosecution of the action.

■ Finally, defendant argues that plaintiff Uwamaliya is inadequate because she has failed to make any payments on her vehicle and thus has no financial stake in the litigation. Assuming plaintiff Uwamaliya may have different damages from at least some members of the class, that fact does not alter her interest in the equitable relief sought in this litigation nor in the actual injury alleged by violations of federal and state laws, which occurred at the time of signing, not as the result of later payment histories. Moreover, courts have rejected the notion that a class representative must have a large financial interest in the litigation. *See* 1 NEWBERG § 3.27 at 3–147, 3–148 (and cases cited there-

in). Plaintiff Uwamaliya, like the other named plaintiffs, avers that she is aware of her obligations as a class representative and that she is prepared to meet those obligations. Defendant has failed to provide sufficient reason to doubt plaintiff Uwamaliya's capacity to serve as class representative.

Accordingly, I am persuaded that each of the named plaintiffs is a suitable and adequate class representative.

### 5. Requirements of Rule 23(b)(3)

■ As I previously have noted, if each of the four requirements of Rule 23(a) is met, the party seeking certification must show that the action falls within one of the categories listed in Rule 23(b). Plaintiffs attempt to demonstrate that the action falls within Rule 23(b)(3), which requires that the common questions predominate over questions affecting individual members and that the class action is superior to other available methods for the fair and efficient adjudication of the controversy. FED. R. CIV. P. 23(B)(3). The two requirements of Rule 23(b)(3) are commonly referred to as predominance and superiority.

Dale Baker Oldsmobile argues, as it did with respect to the commonality requirement of Rule 23(a)(2) that common questions neither exist nor predominate over the individual claims. As I previously have determined, however, the undisputed core facts establish common treatment of applicants for financing through the special finance department which raise identical questions of legality under federal and state law. These common questions represent the core of the dispute for all named plaintiffs and purported class members.

Defendant claims that the questions do not predominate because all plaintiffs have made some individual allegations and different payment histories. Specifically, Dale Baker argues that plaintiff Christian has an individual claim that he was pressured to sign the document before reading, a claim not shared by other plaintiffs. Dale Baker also claims that plaintiff Lozada paid Dale Baker Olds, while the remaining plaintiffs ostensibly paid different parties, refinanced, or did not pay at all.

None of these arguments, however, may successfully be viewed as undermining the predominance of the TILA and state-law claims. The distinctions do not affect the centrality of the principle legal questions. I therefore conclude that the class claims predominate over any individual claims.

■ In determining whether certification of class action is superior to other available methods, Rule 23(b)(3) lists a variety of factors to be considered by the court: (1) the interest of class members in individually controlling the prosecution of separate actions; (2) the extent and nature of any litigation already commenced by members of the class; (3) the desirability of concentrating the litigation in a particular forum; and (4) any management difficulties likely to be encountered if a class action is certified. *See* FED. R. CIV. P.23(b)(3). These factors are not exhaustive, and the court may consider such other factors as may be relevant to the litigation. *See* 1 NEWBERG § 4.28 at 4–113; *Boggs v. Alto Trailer Sales, Inc.*, 511 F.2d 114 (5th Cir.1975). The factors, however, are directed to the notions of judicial integrity, convenience and economy. *See Hurwitz v. R.B. Jones Corp.*, 76 F.R.D. 149 (W.D.Mo. 1977).

As plaintiff notes, consumer class actions are recognized as particularly efficient where individual claims are small:

> "A class action permits a large group of claimants to have their claims adjudicated in a single lawsuit. This is particularly important where, as here, a large number of small and medium sized claimants may be involved. In light of the awesome costs of discovery and trial, many of them would not be able to secure relief if class certification were denied...."

*In re Folding Carton Antitrust Litigation*, 75 F.R.D. 727, 732 (N.D.Ill.1977); *see also Mace v. Van Ru Credit Corp.*, 109 F.3d 338, 344 (7th Cir.1997) (the policy behind maintenance of class actions is to aggregate "the relatively paltry potential recoveries into something worth someone's (usually an attorney's) labor.") *Lake v. First Nationwide Bank*, 156 F.R.D. 615, 628–29 (E.D.Pa.1994) ("Given the relatively small amount recovera-

ble by each potential litigant, it is unlikely that, absent the class action mechanism, any one individual would pursue his claim, or even be able to retain an attorney willing to bring the action."); *Brady v. LAC, Inc.*, 72 F.R.D. 22, 28 (S.D.N.Y.1976) ("[O]ne of the primary functions of the class suit is to provide a device for vindicating claims, which, taken individually, are too small to justify legal action but which are of significant size if taken as a group.")

Plaintiffs make extensive arguments why certification of this action meets each of the questions respecting superiority. First, any interest the class members may have in controlling individual actions is minimal. Virtually identical relief is sought for the named plaintiffs and the class members and, by proceeding in a class action, class members obtain the benefit of representation by experienced consumer rights attorneys.

Second, no other cases previously have been filed concerning the subject matter of this case.

Third, concentration of the litigation of these claims in a single suit is desirable because liability is established in a single proceeding, saving attorney time and expenses for both plaintiffs and defendant. In addition, as the *Watkins* court noted, pursuit of relief in a class action better assures that the class of injured persons will achieve complete relief. *See Watkins*, 618 F.2d at 404.

Fourth, this action is unlikely to cause substantial problems for case management. Indeed, because of the lack of dispute regarding the underlying conduct and the uniformity and predominance of the common questions, the case is particularly manageable.

Defendant has not disputed that plaintiff has shown superiority under the four questions articulated in Rule 23(b)(3). Instead, defendant argues that in the context of the TILA's statutory history, this class action should not be certified.

In early decisions under TILA, courts were reluctant to certify class actions because of statutory minimum individual recoveries, which could be aggregated to ruinous proportions. *See Watkins v. Simmons and*

*Clark, Inc.*, 618 F.2d 398, 399 (6th Cir.1980); *Ratner v. Chemical Bank New York Trust Co.*, 329 F.Supp. 270 (S.D.N.Y.1971); *Wilcox v. Commerce Bank*, 55 F.R.D. 134 (D.Kan. 1972). As a result, a number of courts reasoned that the class action was not superior to other methods available for fair and efficient adjudication of the controversy. *Watkins*, 618 F.2d at 400.

In 1974 and again in 1976, Congress amended the Truth in Lending Act to alter the right to statutory minimum individual damages in the context of a class action and to raise the maximum amount recoverable in a class action. *Compare* 15 U.S.C. § 1640(a)(2)(A) (providing minimum statutory damages in individual actions) *with* 15 U.S.C. § 1640(a)(2)(B) (eliminating minimum individual damages in class action recovery and making amount of recovery subject to judicial determination of reasonableness). The legislative history reveals congressional intent "to counter the manifest judicial unwillingness to impose class liability under the Act." *Watkins*, 618 F.2d at 400. The increase in the maximum amount recoverable was intended to limit devastating exposure of creditors while not unreasonably restricting the use of class actions to enforce the intent of Congress. *Id.* at 401. Subsequent to the amendments, courts routinely have certified class actions. *Id.* at 402.

Citing *Watkins*, 618 F.2d at 402, defendant contends that Congress did not intend by the 1974 and 1976 amendments to make the certification of class actions mandatory in every TILA action. In *Watkins*, the Sixth Circuit held that the district court's refusal to certify a class action was not an abuse of discretion. *Watkins* involved a challenge to the language used in a TILA disclosure form that did not conform precisely with the terminology required by the Act. Following the filing of the individual action in that case, the creditor promptly changed its disclosure form to comport with the TILA. The district court described the violations as technical and refused to certify the class. While upholding the district court's refusal to certify, the court of appeals expressly noted that persuasive arguments existed for certification of a class even in circumstances where the viola-

tions were merely technical. The *Watkins* court recognized that the TILA expressed an intent to punish violations of the TILA whether or not those violations were technical. Indeed, the court acknowledged that were review *de novo*, it might well have certified the class. It concluded, however, that it could not say that refusal to certify constituted an abuse of discretion because to do so would be tantamount to mandating certification in all cases, undermining the discretionary authority conferred on the district court. *Id.* at 404.

While *Watkins* suggests that the Sixth Circuit might possibly not overturn a decision by this court to deny certification, the reasoning of the decision and the facts of this case both support certification of the instant class. First, the language and structure of the Act and the legislative history both suggest that Congress intended to encourage class actions and intended the TILA to be enforced both in technical terms and substantive requirements. As the *Watkins* court described it,

> [a] Report of the Senate Committee which issued the amending bill makes clear that Congress intended that the threat of "class liability" should serve to induce compliance with the Act even in cases where the violations are merely technical, involving no actual damages. The Committee noted that " '[m]ost Truth–in–Lending violations do not involve actual damages and some meaningful penalty provisions are therefore needed to insure compliance.' "

*Watkins*, 618 F.2d at 403 (quoting S.Rep. No. 93–278, pp. 14–15).

Second, this case does not allege the same kind of violations as those alleged in *Watkins*. While defendant describes the instant violations as merely technical, the violations in this case, unlike those in *Watkins*, were not "technical" in the sense that they involved use of different language than that required by the TILA. Instead, while Dale

Baker admittedly made TILA disclosures, it did not provide those disclosures in a form the plaintiffs could keep until after consummation of the contracts. As a result, the undisputed facts reveal that plaintiffs did not receive a substantive right under the TILA and Regulation Z—they did not receive papers they could take with them to other potential creditors prior to closing their deals. Regardless of whether these or other class members wished to or attempted to go to other lenders, the loss is not merely technical. It is a loss of a substantive right provided by the TILA and Regulation Z. *Cf. Stone v. Mehlberg*, 728 F.Supp. 1341 (W.D.Mich.1989) (holding that failure to provide plaintiffs with two copies of the rescission notice to each obligor "is not a mere technicality.").

Moreover, the facts of this case are quite different from *Watkins*. The *Watkins* court expressly noted that in addition to committing purely technical violations, the defendant in that case was a small store, the violations represented the first time the requirements of TILA were brought to the store's attention, and over 1000 persons had received the same disclosure form. The *Watkins* court concluded that in the particular circumstances of that case, if the appeals court were to conclude the district court had erred, the district court's discretion would be rendered nugatory. The Sixth Circuit, however, expressly cautioned against a broad reading of the decision, noting that class certification "is desirable and should be encouraged." *Id.* at 404. The court further noted that the class action provides an opportunity to educate a segment of the public about the duties of creditors and that, in the absence of a class action, most members of the class will not be aware of their rights and would not pursue rights in their own behalf because of ignorance. *Id.* As a result, while affirming the district court, the Sixth Circuit strongly reinforced the strong presumption of the appropriateness of class relief in such cases.[4]

---

4. I note in passing that defendant has distorted the import of the *Watkins* case in at least two places in its brief. First, defendant relies on language in footnote 4 of the opinion as support for a current interpretation of TILA. *See* Def. Response to Motion for Class Certification (dock-

et # 92) at 17. The quoted language, however, represents the Sixth Circuit's summary of case law leading up to the 1974 and 1976 amendments to the TILA. Second, defendant suggests that the Sixth Circuit quoted with approval the language of the district court that the TILA in-

Defendant also relies on *Shroder v. Suburban Coastal Corp.*, 729 F.2d 1371 (11th Cir. 1984), in which the court agreed with *Watkins* that it could not find a district court decision to deny certification to be an abuse of discretion. As in *Watkins,* the Shroder violations were technical, in that the forms that were used failed to place required language in a larger typeset and failed to use the same descriptive terms in the disclosure statement as in the prepayment penalty in the promissory note. *Id.* at 1382–83. The violations at issue in the instant case, in contrast, are not technical in the same sense. Moreover, *Shroder,* like *Watkins,* does no more than permit a denial of certification; it does not endorse denial as a matter of routine practice.

Further, in the instant case, plaintiffs allege violations of state law mandating the delivery of a copy of the RISC and mandatory disclosures to the consumer at the time of signing. *See* Motor Vehicle Sales Finance Act, Mich. Comp. Laws § 492.112(c) ("An exact copy of the installment sale contract shall be furnished by the seller to the buyer without charge at the time the buyer signs the contract...."); Motor Vehicle Installment Sales Contracts Act, Mich. Comp. Laws § 566.302 ("Every retail installment sale of a motor vehicle shall be evidenced by an instrument in writing signed by the retail buyer and a copy thereof delivered to him by the retail seller at the time of its execution...."). The failure to deliver documents as expressly required under Michigan law can hardly be described as a "technical" violation of those acts.

Taken together, I am persuaded that the alleged violations in the instant case are not merely technical. Instead, they represent the deprivation of a substantive right under the TILA and Michigan law. The violations defendant admits occurred were identical to members of the proposed class during the period the special finance department was directed by the Moores. The basic question of liability is best and most efficiently addressed in a class action. The action therefore is superior to a series of 400 to 500 essentially identical individual actions.

I therefore am satisfied that the instant action meets the requirements of FED. R. CIV. P. 23(b)(3). In light of my conclusion, I need not address plaintiffs' contention that the action also meets the requirements of Rule 23(b)(2).[5] Accordingly, plaintiffs' motion to certify the class is **GRANTED**.

### B. *Motion for Partial Summary Judgment*

#### 1. Standard of Review

On a motion for summary judgment, the court must consider all pleadings, depositions, affidavits and admissions and draw all justifiable inferences in favor of the party opposing the motion. *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.,* 475 U.S.

---

tended only to assure compliance, not punish technical violators. *See* Def. Br. at 17. Instead, the *Watkins* court cited the district court's language and upheld the result, but noted that Congress did not distinguish between technical violations and more egregious violations of the act. *Id.* at 403. The court also acknowledged that a judicial practice of denying certification and permitting a defendant to comply after being subjected only to the limited damages in an individual case would nullify the prophylactic effect of the class remedy, which was intended to prompt creditors to comply without the necessity of bringing a suit. *Id.* at 402 n. 8. The court further noted that Congress intended meaningful penalties to assure this result. *Id.* at 403. In other words, the Sixth Circuit expressed substantial disagreement with the premise of the district court.

5. Although I need not decide the question, I am skeptical of defendant's argument that the action could not be certified under Rule 23(b)(2), which authorizes class actions for the purpose of achieving injunctive or declaratory relief where the party opposing relief has acted or refused to act on grounds generally applicable to the class. Dale Baker asserts that because it has discontinued the practice, injunctive or declaratory relief is not available. However, voluntary cessation of a practice does not necessarily moot the claim for injunctive or declaratory relief. *See Friends of the Earth, Inc. v. Laidlaw Envtl. Servs. (TOC), Inc.,* 528 U.S. 167, 120 S.Ct. 693, 145 L.Ed.2d 610 (2000) (holding that defendant's voluntary cessation of challenged practice will moot an action only where defendant can show that subsequent events make it "absolutely clear that the allegedly wrongful behavior could not reasonably be expected to recur."). Moreover, declaratory and injunctive relief may be proper with respect to third-party attempts to enforce existing contracts that have since been resold.

574, 587, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986). The party moving for summary judgment has the burden of pointing the court to the absence of evidence in support of some essential element of the opponent's case. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986); *Street v. J.C. Bradford & Co.*, 886 F.2d 1472, 1479 (6th Cir.1989). Once the moving party has made such a showing, the burden is on the nonmoving party to demonstrate the existence of a genuine issue for trial. *Id.*

In order to prove that a triable issue exists, the nonmoving party must do more than rely upon allegations, but must come forward with specific facts in support of his or her claim. *Id.* After reviewing the whole record, the court must determine "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Booker v. Brown & Williamson Tobacco Co., Inc.*, 879 F.2d 1304, 1310 (6th Cir.1989) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251–52, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986)). " '[D]iscredited testimony is not [normally] considered a sufficient basis' " for defeating the motion. *Anderson*, 477 U.S. at 256–57, 106 S.Ct. 2505 (quoting *Bose Corp. v. Consumers Union of United States, Inc.*, 466 U.S. 485, 512, 104 S.Ct. 1949, 80 L.Ed.2d 502 (1984)). In addition, where the factual context makes a party's claim implausible, that party must come forward with more persuasive evidence demonstrating a genuine issue for trial. *Celotex*, 477 U.S. at 323–24, 106 S.Ct. 2548; *Matsushita*, 475 U.S. at 586–87, 106 S.Ct. 1348; *Street*, 886 F.2d at 1480.

## 2. Truth in Lending Act

The TILA requires creditors to make certain cost-of-credit disclosures "before the credit is extended." 15 U.S.C. § 1638(b). Those disclosures include the identity of the creditor, the amount financed, the finance charge, the annual percentage rate, the total of payments, and the total sale price. 15 U.S.C. § 163(a). The stated purpose of the TILA is "to assure meaningful disclosure of credit terms so that the consumer will be able to compare more readily the various credit terms available to him and avoid the uninformed use of credit." 15 U.S.C. § 1601(a).

 The TILA grants broad authority to the Federal Reserve Board to promulgate regulations necessary to implement the Act. *See Mourning v. Family Publications Service, Inc.*, 411 U.S. 356, 366, 93 S.Ct. 1652, 36 L.Ed.2d 318 (1973); 15 U.S.C. § 1604(a). Courts interpreting the TILA defer to the regulations developed by the Federal Reserve Board. *See Begala v. PNC Bank, Ohio, Nat'l Ass'n*, 163 F.3d 948, 950 (6th Cir.1998). Because the TILA is a remedial statute, the courts also give liberal construction to the Act in favor of the consumer. *See id.* (citing cases).

Pursuant to its grant of authority, the Federal Reserve Board adopted Regulation Z, 12 C.F.R. § 226.1 *et seq.* Both the Act and Regulation Z require that a creditor in a closed-end transaction make disclosures to the consumer of the following items: the identity of the creditor, the amount financed, the annual percentage rate, the total of payments, and the total sale price. *See* 15 U.S.C. § 1638(a); 12 C.F.R. § 226.18. The TILA requires that a creditor make the required disclosures "before the credit is extended." 15 U.S.C. § 1638(b). Regulation Z provides that "[t]he creditor shall make disclosures before consummation of the transaction." 12 C.F.R. § 226.17(b). "Consummation" is defined as the time "the consumer becomes contractually obligated on a credit transaction." 12 C.F.R. § 226.2(a)(13). Regulation Z also provides the manner in which disclosures shall be made. In closed-end credit transactions, "[t]he creditor shall make the disclosures ... clearly and conspicuously in writing, in a form that the consumer may keep." 12 C.F.R. § 226.17(a)(1).

In their complaint, plaintiffs contend that the date of consummation in plaintiffs' credit transactions is the date on which they signed their contracts and thereby became "contractually obligated" to pay. *See* 12 C.F.R. § 226.2(a)(13). They further contend that Dale Baker Olds failed to comply with Regulation Z because, while Dale Baker Olds showed written disclosures to plaintiffs prior to their signing, it failed to provide those

disclosures "in a form that the consumer may keep" prior to plaintiffs becoming contractually obligated to pay. 12 C.F.R. §§ 226.17(a)(1), (b).

Dale Baker Olds previously moved to dismiss, contending that plaintiffs' sole federal claim under the TILA fails to state a claim for relief. Dale Baker makes the identical claims now. It first contends that assuming the date plaintiffs signed their contracts was the date of consummation, Dale Baker nevertheless complied with the regulation because it made the required disclosures to plaintiffs in writing before plaintiffs signed their contracts of sale by showing them the written disclosures. Dale Baker contends that Regulation Z does not require that a copy of the disclosures be delivered to the plaintiffs prior to consummation.

In ruling on the earlier motion to dismiss, I rejected Dale Baker's contention and I continue to adhere to that earlier analysis. Regulation Z explicitly states that the required disclosures be made "in writing, in a form that the consumer may keep." 12 C.F.R. § 226.17(a)(1). Were the court to accept the position of Dale Baker that the regulation required only that consumers be shown the disclosures before becoming contractually obligated, the phrase "in a form that the consumer may keep" would be rendered meaningless. In other words, if the regulation means no more than that disclosures be made to consumers *in writing*, no additional meaning would be conveyed by requiring the form be one the consumer could keep.

■ As a basic principle of statutory construction, in interpreting any statute or regulation, this court must select an interpretation that gives meaning to all parts of that statute or regulation. *See Armstrong Paint & Varnish Works v. Nu–Enamel Corp.*, 305 U.S. 315, 333, 59 S.Ct. 191, 83 L.Ed. 195 (1938) ("Where, as here, the language is susceptible of a construction which preserves the usefulness of the section, the judicial duty rests upon this Court to give expression to the intendment of law."). The presence of the phrase, therefore, compels a conclusion that the regulation requires actual delivery of the disclosures to the consumer.

■ The language of the phrase itself also suggests that delivery is required. Requiring that disclosures be made before consummation in a "form that the consumer may keep" requires that the actual consumer involved in the transaction receive disclosures and be able to keep those disclosures before consummation. If the court were to accept Dale Baker's contention that showing the disclosures to a consumer before consummation is sufficient to comply with the regulation, then either the consumer who may keep the disclosures would be rendered hypothetical or the timing for disclosure in the form *this* consumer may keep would necessarily be post-consummation, which is after the time required by § 226.17(b).

I am persuaded that the plain language of 12 C.F.R. § 226.17(a)(1), when read together with 12 C.F.R. § 226.17(b), requires delivery of a copy of the required disclosures to a consumer before consummation of the transaction. Moreover, the courts which have addressed this issue have uniformly held that pre-consummation delivery of a copy of the disclosures is necessary to meet the requirements of the regulations. *See Polk v. Crown Auto, Inc.*, 221 F.3d 691 (4th Cir.2000) (reversing grant of summary judgment to defendant and granting partial summary judgment to plaintiff because plain meaning of Regulation Z is that disclosures must be provided in writing in form consumer can take with him prior to consummation); *Jenkins v. Landmark Mortgage Corp. of Virginia*, 696 F.Supp. 1089, 1091 (W.D.Va.1988) (holding that consumer did not receive the disclosures in a form she could take with her until after consummation where consumer was shown and signed disclosures at time she signed contract, but did not receive a copy of disclosures until several days later); *In re Williams*, 232 B.R. 629 (Bankr.E.D.Pa.) (holding that failure to provide consumer with copy of TILA disclosures constituted failure to disclose), *aff'd as corrected*, 237 B.R. 590 (E.D.Pa.1999); *Shepeard v. Quality Siding & Window Factory, Inc.*, 730 F.Supp. 1295, 1300 (D.Del.1990) (holding that disclosures must be made in writing and that consumer must be given a copy of the written disclosure); *In re Ralls*, 230 B.R. 508,

515 (Bankr.E.D.Pa.1999) (holding that Regulation Z requires that lenders disclose to consumers in writing "in a form the consumer may examine and retain for reference").

Finally, this interpretation of the regulation is most fully consistent with the purpose of the statute. The stated purpose of TILA was "to assure a meaningful disclosure of credit terms so that the consumer will be able to compare more readily the various credit terms available to him and avoid the uninformed use of credit." 15 U.S.C. § 1601(a). The purpose is to provide the borrower "an opportunity to do some comparative shopping for credit terms." *Wachtel v. West*, 476 F.2d 1062, 1064 (6th Cir. 1973), *cert. denied* 414 U.S. 874, 94 S.Ct. 161, 38 L.Ed.2d 114 (1973). Without being able to take a copy of the terms of the disclosures to another credit source, the consumer is far less able to compare the reasonableness of the terms. *See id.* at 1065 (stating that to fully serve the purposes of the Act, "the borrower must have the required information in his possession before he commits to any particular lender.").

As it did in its motion to dismiss, Dale Baker Oldsmobile next contends that the transactions were not consummated until Dale Baker successfully obtained approval of financing through a sub-prime lender. Dale Baker Oldsmobile contends that until such time as financing was obtained, plaintiffs did not become obligated to pay on their installment contracts. Accordingly, Dale Baker asserts that it was not required to provide a copy of the disclosures until financing was obtained.

■ First, even were the transaction not consummated until financing was approved, plaintiffs would be entitled to summary judgment. Dale Baker Olds does not represent that it sent a copy of the disclosures to each plaintiff before financing was approved. Instead, Dale Baker asserts that plaintiffs received copies of their documents *after* financing was approved. In light of my conclusions regarding the meaning of Regulation Z disclosure requirements, such disclosures still would not be timely.

■ Second, Dale Baker's interpretation of when consummation occurred under the Act is at odds with the plain meaning of the regulations. Pursuant to 12 C.F.R. § 226.2(a)(13), "consummation" is defined as "the time that a consumer becomes contractually obligated on a credit transaction." The Official Staff Commentary to the regulations makes clear that when a contractual obligation on the consumer's part is created is a matter to be determined under applicable state law. Official Staff Commentary § 226.2(a)(13). Under Michigan law, a contract unquestionably was created when plaintiffs signed their retail installment contracts and security agreements. The documents, which were drafted by Dale Baker Oldsmobile and presented to plaintiffs, purported to be contracts and by their signatures the plaintiffs agreed to be bound by the terms of those contracts. Dale Baker Olds did not make the contracts contingent on plaintiffs' obtaining financing. Accordingly, under state law and under the Act, plaintiffs consummated their transactions at the time they entered into the retail installment contracts.

■ Dale Baker asserts, however, that each of the plaintiffs signed another document entitled "Addendum" or "Rider" at the time they signed their installment contracts. Def. Br. (docket # 109), Ex. 2. While the language of the "Rider" signed by plaintiff Christian differs slightly, the other named plaintiffs signed a document entitled "Addendum," which stated:

This is to acknowledge that you have been informed that your loan is not approved until the loan company has sent funds on this deal. Funding can take anywhere from one week to one month. If during the period from accepting delivery of your car to funding of your loan, even if/or [sic] the circumstances are beyond your control, you hereby authorize Dale Baker Oldsmobile to repossess the vehicle at your expense. Reasons that may prevent funding include but are not limited to:

♦ Move from stated residence for any reason

♦ Loss of job for any reason

♦ Phone disconnected for any reason

♦ Failure to provide any and all documentation i.e. money, trade, title ect [sic]

♦ Failure to provide acceptable insurance

Def. br., Ex. 2. Defendant contends that the "Addendum" creates a genuine issue of fact about when the agreement was consummated and what Dale Baker's intent was at the time of the transaction.

I disagree. First, each RISC signed by plaintiffs purports to be a binding contract, containing all of the terms of an agreement and stating that by signing plaintiffs agree to be bound to all terms. The terms of the RISC require plaintiffs to pay a sum certain in fixed monthly installments and to incur interest at 21%. Plaintiffs also agree to a lengthy series of remedies for the seller should they fail to pay as agreed. The RISC makes no reference to any side agreement and the addendum makes no reference to the RISC. Neither the agreement nor the RISC suggests that the RISC is contingent on any other act or that the consumer signing the RISC is not contractually bound.

As a result, nothing about the addendum suggests that plaintiffs were not contractually bound at the time of signing the RISC. Because the TILA defines the time of consummation as the time plaintiff became legally bound, the agreement was consummated at the time plaintiffs signed their RISCs. Moreover, as previously noted, even if the agreements were not consummated until the third-party lender agreed to the loan, Dale Baker did not provide copies of the disclosures until after that time.

In addition, the addendum is not enforceable as a matter of Michigan law. Pursuant to the Motor Vehicle Sales Finance Act, "[a]n installment sales contract shall be in writing, and shall contain all of the agreements between the buyer and the seller relating to the installment sale of the motor vehicle sold. . . ." Mich. Comp. Laws § 492.112(a). Similarly, the Motor Vehicle Installment Sales Act provides that "[e]very retail installment sale of a motor vehicle shall be evidenced by an instrument in writing. . . . The written instrument shall contain all of the agreements of the parties made with reference to the subject matter of the retail installment sale. . . ." Mich. Comp. Laws § 566.302. As a result, under both provisions of state law, the addendum was not an enforceable supplement to the RISC.

Dale Baker asserts, however, that a genuine issue of fact exists as to whether it ever intended to act as a lender in any of the transactions at issue in this case. It contends that its lack of intent is apparent from the "Addendum." However, as I have noted, the Addendum is not an enforceable part of the RISC under Michigan law.

■ Moreover, under ordinary principles of Michigan contract law, the best evidence of the parties' intent is the contract itself. *See Smith v. Physicians Health Plan, Inc.*, 444 Mich. 743, 514 N.W.2d 150 (1994). When the contract terms are plain and unambiguous, a court will construe the contract as it is written and presume the parties' intent is consistent with the ordinary meaning of the terms in the contract. *See Pierson Sand & Gravel, Inc. v. Pierson Township*, 851 F.Supp. 850 (W.D.Mich.1994). On the face of the contracts, Dale Baker Oldsmobile agreed to provide a particular car in exchange for payments made on installment terms contained in the agreement. The agreement by its terms demonstrates that Dale Baker intended to serve as a lender and Dale Baker may not now introduce evidence of a contrary intent.

■ Moreover, the TILA defines a creditor as the "person to whom the debt arising from the consumer credit transaction is initially payable on the face of the evidence of indebtedness." 15 U.S.C. § 1602(f). On the face of the agreements, Dale Baker Olds is such a person and is therefore a creditor as a matter of law under the TILA.

■ For all these reasons, in light of the undisputed facts, plaintiffs are entitled to summary judgment on their claim that Dale Baker Olds violated the TILA when it failed to provide a copy of the TILA disclosures to plaintiffs prior to their becoming obligated under their retail installment sales contracts.

### 3. State-law Claims

Plaintiffs also allege that Dale Baker's undisputed failure to provide copies of cost-of-credit disclosures to plaintiffs at or before the time of signing violated as a matter of law the Motor Vehicle Installment Sales Contracts Act ("MVISCA"), Mich. Comp. Laws § 566.301 *et seq.* Plaintiffs also allege that defendant's undisputed conduct in failing to provide a copy of the cost-of-credit disclosures and the RISC at the time of signing violated the Motor Vehicle Sales Finance Act ("MVSFA"), Mich. Comp. Laws § 492.101 *et seq.* Finally, plaintiffs allege that Dale Baker's failure to provide plaintiffs with copies of written disclosures of the cost of credit violated the Michigan Consumer Protection Act ("MCPA"), Mich. Comp. Laws § 445.901 *et seq.*

#### · a. MVISCA

Under the MVISCA, each RISC signed by plaintiffs was required to

contain all of the agreements of the parties made with reference to the subject matter of the retail installment sale and shall recite the following separate items as such and in the following order: (1) the cash price of the motor vehicle which is the subject matter of the retail installment sale; (2) the amount in cash of the retail buyers' down payments, whether made in money or goods or partly in money and partly in goods; (3) the unpaid balance of the cash price payable by the retail buyer to the retail seller, which is the difference between items 1 and 2; (4) the cost to the retail buyer of any insurance the retail seller has agreed to procure, if the retail seller has agreed to purchase the insurance and extend credit to the retail buyer for the price thereof and if the term of such insurance is less than the contract period, the period of the coverage also shall be recited; (5) the principal balance owed on the retail installment contract, which is the sum total of items 3 and 4; (6) the amount of the finance charge; (7) the time balance owed by the retail buyer to the retail seller and the number of installment payments required and the amount and date of each payment necessary finally

to pay the time balance, which is the sum total of items 5 and 6.

Mich. Comp. Laws § 566.302. The MVISCA also requires that a copy of the RISC containing such disclosures "shall be delivered to [the retail buyer] by the retail seller at the time of its execution." *Id.* Because Dale Baker did not provide a copy of the RISC, including the disclosures, to each plaintiff class member at the time of signing, plaintiffs contend they are entitled to summary judgment under the MVISCA.

I agree. Defendant does not dispute that it failed to deliver a copy of the RISC at the time plaintiffs "executed" their agreements, as required by the MVISCA. Indeed, defendants' response to plaintiffs' motion is limited to the previously discussed question of when the transaction was "consummated" under the TILA, a question irrelevant to the requirements of the MVISCA. As a matter of law, defendant's failure to deliver to plaintiffs a copy of the RISC at the time each was signed violated the MVISCA.

#### b. MVSFA

A parallel Michigan statute, the MVSFA, also requires the seller in a motor vehicle sales transaction to make various cost-of-credit disclosures in a written installment sales contract. *See* Mich. Comp. Laws § 492.113. The MVSFA requires that a copy of the installment sales contract "shall be furnished by the seller to the buyer without charge at the time the buyer signs the contract." Defendant undisputedly did not provide to plaintiffs a copy of each installment sales contract at the time each signed his or her contract. Accordingly, plaintiffs are entitled to summary judgment on defendant's liability under the MVSFA.

#### c. MCPA

The Michigan Consumer Protection Act prohibits a variety of "unfair trade practices" in "the conduct of trade or commerce." Mich. Comp. Laws § 445.903. Plaintiffs allege that Dale Baker's failure to provide named plaintiffs and other class members with copies of the written disclosures of the cost-of-credit prior to or at the time of signing of their retail installment contracts amounted to unfair trade practices as defined

by the MCPA. Specifically, plaintiffs contend, Dale Baker's conduct "caus[ed] a probability of confusion or of misunderstanding as to the legal rights, obligations, or remedies of a party to a transaction," as prohibited by Mich. Comp. Laws § 445.903(1)(n). Plaintiffs further contend that Dale Baker's failure "caus[ed] a probability of confusion or of misunderstanding as to the terms or conditions of credit if credit is extended in a transaction," as prohibited by § 445.903(1)(o). Plaintiffs also contend that Dale Baker violated the MCPA by "representing that a consumer will receive a ... benefit [financing] as an inducement for entering into a transaction, if the benefit is contingent on an event to occur subsequent to the consummation of the transaction [sale of the RISC to a third party finance company]," in violation of § 445.903(1)(w). Finally, plaintiffs argue that by requiring each plaintiff to sign a RISC acknowledging receipt of a copy of the RISC, Dale Baker "[took] or arrang[ed] for the consumer to sign an acknowledgment, certificate, or other writing affirming acceptance, delivery, compliance with a requirement of law, or other performance, where [Dale Baker] kn[ew] or ha[d] reason to know that the statement is not true," in violation of § 445.903(1)(v).

Dale Baker makes no independent argument to dispute plaintiffs' motion with respect to each of the alleged breaches of the MCPA. As I previously noted, the party moving for summary judgment has the burden of pointing the court to the absence of evidence in support of some essential element of the opponent's case. *Celotex Corp. v. Catrett,* 477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986); *Street v. J.C. Bradford & Co.,* 886 F.2d 1472, 1479 (6th Cir. 1989). Plaintiffs clearly have pointed to undisputed facts that would support a finding that Dale Baker violated each cited provision of the MCPA. Once plaintiffs have made such a showing, the burden shifted to Dale

Baker to demonstrate the existence of a genuine issue for trial. *Id.* Dale Baker has failed to meet this burden or even make an argument that a question of fact exists. As a consequence, plaintiffs are entitled to summary judgment on their claims under the MCPA.

### C. *Motion to Bar Defendant's Expert from Testifying*

Plaintiffs have moved to bar defendant's expert witness from testifying in this case. Plaintiffs contend that the opinions proffered by the witness in the expert report do not satisfy the requirements of FED. R. EVID. 702. Plaintiffs' motion was filed on July 6, 2000 and served by mail. As a result, defendant's response was due on July 24, 2000, over one month before the issuance of this opinion. Defendant has failed to respond to the motion. As a consequence, plaintiffs' motion is uncontested and shall be **GRANTED.**[6]

### III.

For the foregoing reasons, each of plaintiffs' motions is granted. Plaintiffs' motion to supplement material submitted in support of class certification (docket # 107) is **GRANTED** and the materials submitted are accepted as part of the supporting documentation for the motion for class certification. Plaintiffs' motion for class certification (docket # 68) is **GRANTED** and the following class is certified against defendant Dale Baker Oldsmobile:

> All persons who executed a retail installment contract through the special finance department of Dale Baker Oldsmobile, Inc., where Dale Baker Oldsmobile, Inc. was identified on the face of the contract as the entity to whom the debt arising from the contract is or was initially pay-

---

**6.** Even had defendant properly responded to the motion, I would conclude that the motion is well founded. The proposed expert testimony does not meet the requirements of Rule 702. The proffered testimony is directed to the question of whether or not Dale Baker's failure to provide a copy of disclosures was a purely technical violation of the TILA and whether or not the expert believes that the plaintiffs understood that the contract was conditioned on the seller's obtaining third-party funding. These opinions are either legal conclusions or otherwise would not assist a trier of fact to "understand the evidence or to determine a fact in issue." FED. R. EVID. 702.

able, and who were not given a copy of the contract at the time of its execution.

The class period in connection with the federal TILA claim is limited to those whose retail installment contracts were executed between August 16, 1998, and August 16, 1999. The class period in connection with the state-law counts is limited to those retail installment contracts executed during the six-year period immediately preceding August 16, 1999.

Plaintiffs' motion for partial summary judgment (docket # 102) also is **GRANTED** as to liability on Counts I to IV of the complaint. Finally, plaintiffs' motion to bar defendant's expert witness from testifying (docket # 108) is **GRANTED**.